[No. 44620.   En Banc.   January 19, 1978.]

RICHARD A. MCCLELLAN, ET AL, *Appellants,* v. CONRAD S. SUNDHOLM, ET AL, *Respondents.*

*Walstead, Mertsching, Husemoen & Donaldson,* and *Charles T. Mertsching (John M. Berman,* of counsel), for appellants.

*Harry R. Calbom, Jr.,* and *J. A. Hamm* (of *Calbom, Cox, Andrews, Hamm & Pond*), for respondents.

HOROWITZ, J.—This appeal raises the question whether a scheme for the sale of silver bullion for investment purposes involves the sale of a security which must be registered under Washington's securities act. Sale of an unregistered security is unlawful under RCW 21.20.140 and subjects the seller to civil liabilities under RCW 21.20-.430(1). We hold that the silver purchase scheme in this case was a scheme for the sale of a security within the meaning of the securities act, and the seller of the unregistered purchase agreement, respondents here, is liable to

appellant purchaser under the provisions of RCW 21.20-.430(1).

Respondent Conrad Sundholm, a Washington resident, approached appellant Richard McClellan in his Washington home in January 1974 as a salesman for Universal Trade Company (the Company). The Company, which had its principal place of business in Portland, Oregon, was engaged in the business of selling bars of silver bullion for investment purposes. Sundholm told appellant that silver was a sound investment. He described the Company's services, which included selection of silver, storage of the bars if the purchaser preferred, ongoing consultation and advice regarding the state of the silver market, and, when desired, resale of the silver for the purchaser at a commission. Appellant agreed to purchase silver and signed a purchase order agreement. Sundholm then advised him payment was to be made by certified or cashier's check payable to Universal Trade *Corporation,* the Company's source of silver.

Appellant obtained a cashier's check in the amount of $7,650, made payable to the Corporation and delivered it personally to the office of the Company in Portland. He was told his silver would arrive in 10 days to 2 weeks. The silver was never delivered.

Universal Trade Company is the assumed business name of Richard Ridout. Monies paid to the Company were used by Ridout not only for silver purchases and business expenses, but also for his own land speculation and personal expenses. Appellant's check, although payable to Universal Trade Corporation, was endorsed by the Company and deposited in its account. Silver was delivered to the Company's office after appellant gave the Company his check, but it was diverted to other, more insistent, customers. The Company never had enough silver at any one time to satisfy existing purchase contracts. In short, Ridout misused customers' funds, with the result that appellant never received the silver bullion for which he had paid.

Appellant now seeks to recover his payment from Sundholm under the civil liabilities section of The Securities Act of Washington, RCW 21.20. RCW 21.20.430(1) provides that "any person, who offers or sells" an unregistered security is liable to the purchaser for the amount paid plus interest, costs, and attorneys' fees. The trial court, while correctly holding this transaction was the sale of an unregistered security, erroneously applied RCW 21.20.430(3). That section exempts from liability those persons who "directly or indirectly" control a seller under certain circumstances. The trial court reasoned that the transaction was the sale of a security only because Ridout diverted appellant's funds, and that because Sundholm did not know of that diversion he was exempt from liability under the provisions of subsection (3). We disagree with the trial court regarding both the reasons for which this transaction was the sale of a security and the application of subsection (3) of the statute.

As a preliminary matter, we note the trial court looked to both Oregon and Washington securities laws in reaching its decision. This reference to Oregon law was presumably made because the principal place of business of the Company was Portland and appellant delivered his check there. We find it unnecessary to refer to Oregon statutes, however. The relevant provisions of the Oregon securities law are substantially identical to those of the Washington statute. *See* ORS §§ 59.015(11)(a) (definition of "sale"); 59.015(13)(a) (definition of "security"); 59.055 (offer or sale of unregistered security unlawful); 59.115 (civil liabilities). Thus no conflict of statutes exists and there is no reason for this court not to apply the law of Washington to these parties.

■ The central question presented is whether the transaction in which respondent Sundholm offered to order and select silver bullion, and give continuing silver investment advice, and appellant McClellen agreed to purchase the bullion, was an offer or sale of a security within the meaning of RCW 21.20.005(12) (definition of "security")

and RCW 21.20.140 (requiring registration). The definition of a security in The Securities Act of Washington is derived substantially from the definition sections of the federal Securities Act of 1933. *Chapman v. Rudd Paint & Varnish Co.,* 409 F.2d 635, 641 (9th Cir. 1969); *State v. Williams,* 17 Wn. App. 368, 370–71, 563 P.2d 1270 (1977); Rooks, *The Blue Sky of Washington: Registration of Securities of a New Venture,* 6 Gonzaga L. Rev. 187, 198 n.69 (1971). Thus it is appropriate to look to federal law construing the 1933 act in considering the meaning of the Washington provision. *State v. Williams, supra* at 371. *See also State v. Carroll,* 81 Wn.2d 95, 109, 500 P.2d 115 (1972).

■ Appellant contends, and we agree, that the transaction here is an "investment contract," a form of security listed in RCW 21.20.005(12). The federal definition of an investment contract was authoritatively stated in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 90 L. Ed. 1244, 66 S. Ct. 1100 (1946). An investment contract within the meaning of the federal Securities Act is an investment of money in a common enterprise, where the investor expects to reap profits from the efforts of the promoter or a third party, *SEC v. W.J. Howey Co., supra* at 298. It should be noted that at least two other tests for the existence of an investment contract have been suggested and applied. The first is whether the investor furnished "risk capital" to an enterprise. *See In re Western Pac. Coin & Silver Exch.,* [1975] Blue Sky L. Rep. (CCH) ¶ 71,203 (Comm'r of Insurance, Iowa). *See also* Coffey, `The Economic Realities of a "Security": Is There a More Meaningful Formula?,* 18 W. L. Rev. 367 (1967). The second alternative test is simply whether the contract is for a placing of capital in a way intended to secure a profit. This test, first articulated by the Minnesota Supreme Court in *State v. Gopher Tire & Rubber Co.,* 146 Minn. 52, 56, 177 N.W. 937 (1920), is still the test under the Minnesota statute today. *State v. Coin Wholesalers, Inc.,* __ Minn. __, 250 N.W.2d 583, 588 (1976).

We choose to employ the federal test for two reasons. First, as noted above, the Washington statutory definition

is derived substantially from the federal statute. This is strong evidence that the intent of the legislature was to adopt existing federal law relating to the definition. Second, the federal test is widely used by state agencies and courts interpreting state securities acts. *See* Annot., *What Constitutes an "Investment Contract" Within the Meaning of State Blue Sky Laws,* 47 A.L.R.2d 1375, 1379 (1973).

■ Under the federal test, then, the first element is the existence of an investment. There is no question here that appellant's agreement to purchase silver was an investment. He was induced to sign the agreement and deliver a check by the description of the purchase as an investment. He clearly considered it to be such. Second, we find the investment venture was a common enterprise. Under the federal test, a common enterprise need not be a common fund. The term denotes rather an interdependence of fortunes, a dependence by one party for his profit on the success of some other party in performing his part of the venture. *SEC v. Glenn Turner Enterprises, Inc.,* 474 F.2d 476, 482 n.7 (9th Cir.), *cert. denied,* 414 U.S. 821, 38 L. Ed. 2d 53, 94 S. Ct. 117 (1973). *Accord, SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 478 (5th Cir. 1974). We find this dependence here. Appellant could expect to gain a profit from his investment only if Universal Trade Company and Universal Trade Corporation wisely managed their own silver selection, purchase, and resale activities. The intended ongoing relationship between the purchaser and the Company emphasizes this aspect of the common enterprise. Appellant was encouraged to rely on the Company for advice on changes in the silver market and, if he desired, for storage of the silver.

The third element of an investment contract under the federal definition, an expectation by the investor that profits will be gained from the efforts of some other party, is also present here. The efforts of the other must be "the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *SEC v. Glenn Turner Enterprises, Inc., supra* at 482.

*Accord, SEC v. Koscot Interplanetary, Inc., supra* at 483. Appellant had no hand in the management of his investment in the silver enterprise. He relied totally on the expertise of the Company to select and purchase an appropriate grade and quantity of silver, arrange for its shipment and delivery to him, and, in the future, obtain the best price on resale.

We note that federal courts have found bullion sales schemes similar to those of Universal Trade Company and Universal Trade Corporation to be schemes for the sale of investment contracts which are securities. *See SEC v. Western Pac. Gold & Silver Exch. Corp.,* [1975] Fed. Sec. L. Rep. (CCH) ¶ 95,064 (D. Nev.); *Jenson v. Continental Fin. Corp.,* 404 F. Supp. 792 (D. Minn. 1975). We note also that securities legislation is remedial in nature and has as its purpose broad protection of the public. Thus it is appropriate to construe the statute broadly in order to maximize the protection offered. *See Tcherepnin v. Knight,* 389 U.S. 332, 19 L. Ed. 2d 564, 88 S. Ct. 548 (1967). We conclude, therefore, that this transaction was the sale of an investment contract which is a security within the meaning of the statute. The existence of a security in this case is not dependent solely on Ridout's diversion of appellant's funds, as found by the trial court. That diversion was only one characteristic of the larger investment scheme involving reliance on the actions of others for success of the profit–seeking venture.

Since there is no question that the security was unregistered, the only remaining issue is which statutory section defines the liability of the respondent. The trial court found RCW 21.20.430(3) applicable. That section defines the civil liability of "every person who directly or indirectly controls a seller or buyer liable under subsection (1) or (2) . . ." Subsection (1), on the other hand, defines the liability of "any person, who offers or sells a security in violation of any provisions of RCW 21.20.140 . . ." The trial court

apparently believed Sundholm did not offer or sell a security, but only directly or indirectly controlled a seller. We disagree.

It is quite clear that Sundholm did offer to sell, and did in fact sell, the security to appellant under the definitions of "offer" and "sell" in RCW 21.20.005(10). An "offer" is an "attempt or offer to dispose of, or solicitation of an offer to buy" a security. This accurately describes respondent's sales approach to appellant. The term "sell" includes "every contract of sale of, contract to sell, or disposition of, a security . . ." We find the purchase agreement here was a disposition, and therefore a sale, of a security.

Respondent's liability is therefore defined by RCW 21.20.430(1), applicable to any person "who offers or sells a security." RCW 21.20.430(3), applicable to one who "directly or indirectly controls a seller" is not relevant. Under RCW 21.20.430(1) respondent is liable to appellant for the amount of consideration paid, in this case, $7,650, together with interest, costs and reasonable attorneys' fees. We accordingly reverse the judgment below and remand this case for entry of judgment for appellant for the total of $7,650 plus 8 percent per annum from the date of payment to the date of filing of the remittitur in this cause, together with costs and reasonable attorneys' fees to be determined by the trial court in accordance with the law.

Reversed.

WRIGHT, C.J., and ROSELLINI, HAMILTON, STAFFORD, UTTER, BRACHTENBACH, DOLLIVER, and HICKS, JJ., concur.